**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 40715**

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JOHN (2013-03) DOE. )<br>)<br>)<br>)<br>_____ ) | 2013 Unpublished Opinion No. 556<br><br>Filed: June 28, 2013 |
| ) | Stephen W. Kenyon, Clerk |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, )<br>)<br>) | THIS IS AN UNPUBLISHED |
| Petitioner-Respondent, )<br>) | OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| v. )<br>) | |
| JOHN (2013-03) DOE, )<br>) | |
| Respondent-Appellant. )<br>_____ ) | |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Carolyn M. Minder, Magistrate.

Decree terminating parental rights, <u>affirmed</u>.

Alan E. Trimming, Ada County Public Defender; Adam C. Kimball, Deputy Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mary Jo Beig, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Chief Judge

John (2013-04) Doe (Father) appeals from the magistrate's decree terminating Father's parental rights to his daughter. Father asserts there is a lack of substantial and competent evidence to support the magistrate's findings that Father is unable to discharge his parental responsibilities for a prolonged, indeterminate period of time, amounting to neglect, and that Father is likely to remain incarcerated for a substantial period of time during the child's minority. Additionally, Father argues the magistrate erred in finding that termination was in the best interests of the child. We affirm.

1

# I.

## FACTS AND PROCEDURE

The Idaho Department of Health and Welfare (Department) filed a Child Protective Act (CPA) case involving Father's minor daughter in December 2011 after the daughter was removed from the mother and taken into shelter care. At the time the Department took the daughter into its custody, Father had recently been paroled after serving a determinate three-year term of a unified ten-year sentence for domestic battery with traumatic injury. Father had committed the crime against the mother while she was pregnant with the daughter. As a result, he was subject to an absolute no-contact order, set to be in place until May 2019, on behalf of the mother and the daughter as protected parties. Thus, the daughter could not be placed into his custody.

After a hearing in January 2012, the magistrate vested legal custody of the daughter with the Department. The Department filed a case plan for Father in early February. The case plan required Father to work with the Department to identify potential placements for his daughter, contact the assigned Department worker once a month, participate in domestic violence treatment, and acquire a drug and alcohol assessment. Upon a request by the Department and a stipulation introduced by the parties, respectively, the magistrate later ordered two modifications of Father's case plan requiring Father to complete a mental health assessment and comply with the evaluator's recommendations, and to attend domestic violence treatment through a specific provider.

In March 2012, Father moved to modify the protection order and was able to obtain permission to have supervised visitations with his daughter. It was at a supervised visitation that Father first legally met his three-year-old daughter in person. Although Father was on the birth certificate and was current with his child support obligations, the daughter had been born while he was incarcerated. Despite the no-contact order, Father had purportedly made previous contact with his daughter through phone calls and letters, read to her by her mother and the paternal grandmother.

At the six-month review hearing, Father was in custody after police officers arrested him on June 4, 2012, on three bench warrants for violations of parole. In the time between the modifications of the no-contact order and his June arrest, Father had maintained adequate housing, was employed, and participated in several supervised visitations with his daughter. At

the visitations, he exhibited appropriate parenting skills and appeared to be establishing a relationship with the daughter. The daughter had some behavioral issues after visitations with Father, but overall was doing well. Father had been attending domestic violence treatment and obtained an initial mental health evaluation, which required further monitoring of Father to determine any recommendations. He was unable to complete the treatment or be subject to further evaluation of his mental health because of his arrest.

Father remained incarcerated until October 2, 2012. He had two supervised visitations with his daughter the following week. However, police officers arrested Father just nine days after his release on another parole violation. Subsequently, on October 24, 2012, the magistrate conducted a hearing and approved a permanency goal of termination of parental rights and adoption for the daughter. Father exercised his right to trial on the issue of termination. The magistrate held a trial in January 2013, while Father remained incarcerated. Father may have been eligible for a parole hearing as early as March or April 2013, but he conceded at trial that it was possible he could remain incarcerated until September 29, 2018, if he were required to serve the rest of his ten-year sentence.[1] After trial, the magistrate entered a decree terminating Father's parental rights in February 2013. The magistrate found there was no parent-child relationship to preserve and that under Idaho Code § 16-2005(1)(b), (d) and (e), Father was unable to discharge his parental duties, which inability would remain for a prolonged, indeterminate period of time, and that Father is likely to remain incarcerated for a substantial period of time during the child's minority. The magistrate further determined the pattern of incarcerations and unavailibility of Father constituted neglect of the daughter and that termination of Father's parental rights was in the best interests of the daughter. Father timely appeals.

## II.

## STANDARD OF REVIEW

The United States Supreme Court has held that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 254-55 (1978). *See also In re Doe*, 146 Idaho 759, 761, 203

---

[1] The date of Father's release, if he were to serve the remainder of his term, was subject to discrepancy. Father alleged his release date would be September 29, 2018. One witness at the termination hearing referenced a possible release date occurring in 2019.

P.3d 689, 691 (2009). Concordantly, the Idaho Legislature has, in the CPA, directed that "the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship." I.C. § 16-1601. Likewise, the Termination of Parent and Child Relationship Act states, "Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2).

Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by "clear and convincing evidence." *Santosky*, 455 U.S. at 769. *See also* I.C. § 16-2009; *Doe*, 146 Idaho at 761-62, 203 P.3d at 691-92; *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245, 220 P.3d 1062, 1064 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order terminating parental rights. *Id.* at 245-46, 220 P.3d at 1064-65. The Idaho Supreme Court has also stated, however, that the substantial evidence test requires a greater quantum of evidence in cases where the trial court finding must be supported by clear and convincing evidence, than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *In re Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the trial court's decision must be supported by objectively supportable grounds. *In re Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## DISCUSSION

### A. Whether Substantial and Competent Evidence Exists to Support a Statutory Ground for Termination

A court may terminate a person's parental rights if it finds a statutory ground exists for termination and termination is in the best interests of the child. I.C. § 16-2005; *Doe v. Roe*, 133 Idaho 805, 810, 992 P.2d 1205, 1210 (1999). The magistrate made two findings of fact that constituted statutory grounds for termination, contained within subsections (1)(b), (d) and (e) of section 16-2005. Combining subsections (1)(b) and (1)(d), the magistrate found that Father is

unable to discharge his parental responsibilities for a prolonged, indeterminate period of time, amounting to neglect. The magistrate additionally found that Father is likely to remain incarcerated for a substantial period of time during the child's minority. The subsections, providing grounds for termination, read as follows:

(b) The parent has neglected or abused the child.
. . . .
(d) The parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child.
(e) The parent has been incarcerated and is likely to remain incarcerated for a substantial period of time during the child's minority.

A neglected child is defined, in relevant part, as a child:

(a) Who is without proper parental care and control . . . necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; . . . or
(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being;

I.C. § 16-1602(25).

Father argues the magistrate failed to find by substantial and competent evidence that the incarceration would continue for a prolonged indeterminate period of time or would be for a substantial period of the child's minority. In terms of the statutory ground of neglect, Father asserts the magistrate erred in finding there was substantial and competent evidence to find that Father neglected his daughter by conduct or by omission or that Father was unable to discharge parental responsibilities, resulting in lack of parental care necessary for the daughter's health, safety, and well-being. He asserts the magistrate must consider the practical realities of Father's situation and the limits imposed by incarceration and the no-contact order. Father points out that he sent letters and attempted phone calls, had visitations with daughter when not incarcerated, and was current with child support obligations. In terms of what was allowed with his daughter, he asserts that he could do no more than what he had been doing.

We begin by reviewing whether there is substantial and competent evidence to support a finding of the statutory ground for termination under subsection (1)(e) regarding incarceration. Subsection (1)(e) focuses both on prior incarceration and the likelihood of future incarceration. *Idaho Dep't of Health & Welfare v. Doe*, 151 Idaho 605, 610, 261 P.3d 882, 887 (Ct. App. 2011). There is no bright-line rule to determine what constitutes a substantial period of a child's

5

minority for which the parent will be incarcerated. *Id.* Rather, whether the period of incarceration is substantial is determined on a case-by-case basis, applying a definition of "substantial" meaning important, essential, or considerable in quantity. *Id.* In this analysis, the court may consider numerous factors including, but not limited to: the probability that the parent will be paroled; the probable length of the parent's incarceration; the probable length of time after release before the parent would regain custody of the child; and the age of the child, including particularly whether he or she is in the formative younger years. *Id.*

There is relatively little Idaho case law regarding subsection (1)(e) and when a parent's incarceration amounts to a substantial period of time during the child's minority. In *Doe*, 148 Idaho at 246, 220 P.3d at 1065, the Idaho Supreme Court addressed the question and held that the magistrate had substantial and competent evidence to support finding a statutory ground for termination under subsection (1)(e) where the father was present in the children's lives until they were roughly four and six years old, but was subsequently convicted of a crime and sentenced to a unified thirty-year term, with twenty-five years determinate. This Court has found substantial and competent evidence supporting a finding that a ground for termination existed under subsection (1)(e) where the father was incarcerated at the time of the child's birth and remained so during the first twenty months of the child's life until parental rights were terminated. *Doe*, 151 Idaho at 610, 261 P.3d at 887. The evidence showed that if the father were to have remained incarcerated until the satisfaction of his full sentence, the child would be nine years old upon the father's release. Even if the father were to have been released on his first parole date, the child would have been three years old and the father would not be eligible to care for the child until he demonstrated he could provide a safe and stable home environment. *Id.* at 610-611, 261 P.3d at 887-88. We recognized that "an absence of an incarcerated parent may be more significant to a very young child than to an older one." *Id.* at 611, 261 P.3d at 888. In affirming the termination order, we relied on a record that demonstrated Doe had been and was likely to remain incarcerated for a "substantial (important or meaningful) period of [the child]'s minority" and concluded the magistrate did not err in finding that Doe's incarceration provided a basis for termination under subsection (1)(e). *Doe*, 151 Idaho at 611, 261 P.3d at 888. In a more recent case, we agreed with the magistrate's finding that a father's incarceration provided a clear basis for terminating his parental rights because he was likely to remain incarcerated for a substantial period of time during the child's minority. *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho

6

797, 807, 275 P.3d 23, 33 (Ct. App. 2012). The father's two children were born in 2008 and 2009, and father was arrested in 2010. *Id.* at 799-800, 275 P.3d at 25-26. The father's earliest parole eligibility date would have come at a time when his children would have been seven and eight years old. If he were to serve out his full sentence, the children would both be in their late teens. *Id.* at 807, 275 P.3d at 33.

In two of the above cases, the parent had a criminal history and had also failed to comply with his case plan during the pendency of the child protection case. *Doe*, 152 Idaho at 799-800, 275 P.3d at 25-26 (noting that the father's criminal history included multiple charges of battery, aggravated assault, and other crimes, and efforts at reunification were suspended prior to termination in part due to failure to comply with a case plan); *Doe*, 151 Idaho at 606-07, 261 P.3d at 883-84 (noting a history of felony convictions and drug use and that the father failed to comply with the case plan). In addition to a child's young age, as in the respective cases, evidence of on-going criminal or unlawful behavior and failure to comply with the case plan during the pendency of the case can be seen as weakening the probability the parent would be paroled and *remain* out of custody. Such evidence can also be weighed in determining the probable length of the parent's incarceration based on the parent's past behavior, as well as the probable length of time after release before the parent would regain custody of the child.

Turning to the facts of this case, evidence at the termination hearing showed that Father was incarcerated when the daughter was born and remained incarcerated until late 2011, when the daughter was roughly three years of age. Even after his release, Father was disallowed by the no-contact order, protecting the mother and daughter, from establishing a relationship with his daughter. Father managed to obtain a modification of the no-contact order in March 2012 to allow for supervised visitations. Although he had purportedly made contact with the daughter in contravention of the no-contact order on prior occasions, Father did not legally meet his daughter until after modification of the no-contact order, allowing Department-supervised visitations. Evidence showed that Father attended several of these supervised visitations with his daughter, had employment for at least a period of three months, and had suitable living arrangements during that time frame. However, Father was re-arrested in June 2012. While back in custody, Father participated in a few video visitations with his daughter. Father was again released on October 2, 2012. Only nine days later, he was again taken into custody for violation of the no-contact order and other parole violations. He remained incarcerated from that time until after

7

the termination hearing. At the time of the hearing, it was possible Father would have an upcoming parole date, but it was also possible that Father would be required to serve the remainder of his sentence, in which case he would not be released until his daughter was nine or ten years old. In addition to the parole violations during the pendency of the CPA case, Father also has a history of criminal charges, including two other domestic battery charges, one other general battery conviction, and some miscellaneous drug offenses. Moreover, even if it were probable that Father would be paroled after committing the most recent violations, Father's probability of regaining custody of the child after release remained limited by the no-contact order. Father provided no evidence that the no-contact order could be further modified to allow for unsupervised visitations. Under the circumstances as they were, even if Father were paroled shortly after the termination hearing, he would not be available to parent his daughter without the aid of the Department supervising visitations until the expiration of the no-contact order in 2019.

As further evidence, the case manager from the Department testified that Father demonstrated a history of frequent incarceration, raising concerns about his availability to parent the child. She pointed out the apparent consequences of incarceration--that a parent cannot provide safe and stable housing or provide adequate care, supervision, or provisions for a child while in custody. She further noted that Father had been absent from the girl's life during her first three years, and although Father had been compliant with his case plan and exhibited appropriate parenting behavior for the few months he was not incarcerated, he did not demonstrate an ability to follow the requirements of his parole or stay out of custody in order to parent his daughter.

The magistrate recognized that for a period of time, February through April 2012, Father had appropriate housing, had some form of income, was working on his case plan, and was attending visits with his daughter. The magistrate also recognized the following: Father was out of prison from January 21, 2012, until June 4, 2012; from June 4, 2012, until October 2, 2012, Father was again incarcerated; and Father was out of custody for nine days until he was re-arrested on October 11, 2012, and remained in prison at the time of the termination hearing. The magistrate further observed that the no-contact order, assuming Father was released before 2019, disallowed any contact with the daughter that was not supervised by the State. The magistrate ultimately concluded there was no parent-child relationship to preserve, that Father's willful parole violations directly precluded his ability to parent the child, and specifically, that

Father's "felony history of drugs and domestic violence has resulted in lengthy incarceration and is likely, in [the] Court's opinion, to result in further incarceration for a substantial period of time during [the child]'s minority."

There is substantial and competent evidence to support the magistrate's finding. Although Father exercised all possible visitations and demonstrated appropriate parenting skills while out of custody, Father fails to recognize that the subsequent arrests in June 2012 and October 2012 resulted from his actions of not following the requirements of parole and the no-contact order. He also fails to acknowledge that the no-contact order, which places severe limitations on his ability to parent the child, again was a result of his criminal behavior towards the mother while she was pregnant with the child. During the pendency of the CPA case, Father demonstrated he was unable or unwilling to comply with the terms of that no-contact order, resulting in his arrests and perhaps carrying the ultimate consequence of being required to serve the remainder of his ten-year sentence. Considering the child's young age, the Father's absence in the daughter's formative years, the evidence of on-going unlawful behavior and failure to comply with the case plan during the pendency of the case, the uncertain possibility of parole, and that the probable time after release before Father would regain custody of the child would be 2019, there is no error in the magistrate's determination that a statutory ground for termination existed under subsection (1)(e).

Father argues that his allegations of error by the magistrate are supported by the Idaho Supreme Court case *Doe v. State*, 137 Idaho 758, 53 P.3d 341 (2002). There, the Court reversed a magistrate's decision to terminate parental rights because, once the incarcerated father learned of his child, the father took all steps he could while in custody to establish a relationship with the child. That case was decided only in relation to the statutory ground of neglect and does not support reversal in this case under any other statutory ground. Whereas in *Doe*, 137 Idaho 758, 53 P.3d 341, it was necessary to evaluate the parent's conduct in prison because he remained incarcerated throughout the pendency of the case and the Court determined the father did everything in his power to act as a parent, here we have evidence of Father's conduct outside of prison. Father was out of custody, exercising visitations, and generally following the case plan. However, he willfully violated parole and was arrested. He was subsequently released and made it only nine days before again being arrested on another willful parole violation. Rather than doing everything in his power to act as a parent toward the child, Father made choices leading to

9

further arrests and incarceration. This is certainly not the same situation as that presented in the Idaho Supreme Court case upon which Father relies. *See also In re Doe*, 143 Idaho at 346-48, 144 P.3d at 600-02 (concluding that *Doe*, 137 Idaho 758, 53 P.3d 341 did not support reversing a decision to terminate parental rights where the father had been incarcerated various times throughout the child's life, had minimal physical contact with her, made minimal attempts to establish or maintain a parental relationship while incarcerated through letters and sending gifts, and willfully violated probation and was re-arrested, making him unavailable to parent until the child would have been roughly six years old).

Each statutory ground is an independent basis for termination. *In re Doe*, 143 Idaho at 345, 144 P.3d at 599; *In re Aragon*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). Where there is sufficient evidence to support one statutory ground of termination, we need only address that ground. *In re Doe*, 143 Idaho at 346, 144 P.3d at 600. Consequently, we do not reach Father's challenge as to the magistrate's finding of a statutory ground under subsections (1)(b) and (1)(d).

**B.      Whether Termination was in the Best Interests of the Child**

Father challenges the magistrate's determination that termination of parental rights was in the best interests of the child. Father accepts that he had limited opportunity to parent his daughter, but points out that he availed himself of every possible way to establish and maintain a relationship. Father contends his relationship with his daughter is vital to her. Moreover, Father asserts the magistrate should have also considered the relationship with the paternal grandmother in determining whether it was in the best interests of the daughter to terminate Father's parental rights.

In cases where the parent has been incarcerated and will continue to be incarcerated for a substantial period of time during the child's minority, the trial court may consider this finding as a factor in whether it is in the best interests of the child to terminate parental rights. *See Idaho Dep't of Health and Welfare v. Doe*, 148 Idaho 832, 840, 230 P.3d 442, 450 (Ct. App. 2010). A court may also consider the effect of a parent's incarceration on the emotional bond between the parent and child and the effect that attempts to establish or maintain that bond in the prison environment may have on the child. *See Doe*, 148 Idaho at 246-47, 220 P.3d at 1065-66. Additionally, the court should consider the extent to which an incarcerated parent is able to make efforts to form or keep the relationship with the child. *See Doe*, 152 Idaho at 799, 275 P.3d at 29. Overall, a parent's previous incarcerations, rehabilitative failures to work on issues that

brought the child into care, the impact the parent's incarceration has had and will continue to have on the child, as well as the quality of contacts or efforts made to keep or establish a meaningful parent-child relationship are all considerations before the court. *Doe*, 151 Idaho at 611, 249 P.3d at 888. Even where the love and affection of the parent to the child is not in question, a magistrate may give other factors in the case of an incarcerated parent greater weight in determining what is in the best interests of the child, as a child needs more than bare parental affection. *Doe*, 143 Idaho at 389, 146 P.3d at 655.

At Father's termination hearing, there was testimony regarding the absence of Father from the child's life for the first three years. The case manager testified regarding the bond a child develops with a parent in the first part of its life. She testified that the absence of Father in the daughter's life during the years when the two could have developed a bond resulted in a situation where the daughter and Father just did not know each other. The roughly twenty hours of visitation, both supervised and via video, during the nearly four years of the daughter's life was not sufficient to establish a truly meaningful and deep parental connection in the opinion of the case manager. Father appropriately parented the daughter during visitations, and as visitations proceeded, the daughter grew to be more comfortable with Father. However, the daughter was also described as a friendly child who was willing to play and interact with Father as she would towards any adult male with whom she was required to spend time. On at least one occasion, the daughter asked to end the visitation early. There was also evidence that visitations with the Father sometimes resulted in angry behavior by the daughter and regression in her potty training. She also, at times, pulled away from Father and asked that he not be around her. The magistrate, based on the evidence of only twenty hours of total contact between Father and the daughter in her entire lifetime, described the relationship between them as that of an acquaintance. The daughter could identify Father as her father, but the case manager testified there was no meaningful or deep parental connection. The magistrate also noted that the scheduling of video visits while Father was either in jail or prison was difficult and complicated to secure. Moreover, the no-contact order limited Father's ability to be a parent to the child. There is no indication in the record as to the likelihood the no-contact order could be further modified. If it were to remain in place, even if Father was to be released prior to serving the rest of his sentence, the State could not place the child in his custody. In other words, the earliest time that Father could be available as a placement for the child's custody would be 2019. The

11

magistrate recognized Father's desire to establish a parental role, but found Father was not in any position to have that desire become a reality. Based on the foregoing, as well as Father's past criminal history, on-going violations of parole, current incarceration and unwillingness to follow basic parole requirements, the magistrate found termination of Father's parental rights was in the best interests of the child. The magistrate additionally cited the child's need for stability and a consistent parental presence in her life. There is no error in the magistrate's decision.

## IV.

## CONCLUSION

We conclude there is substantial and competent evidence supporting a statutory ground for terminating Father's parental rights based on the finding that he has been and will continue to be incarcerated for a substantial period of time during the child's minority. We further conclude that the magistrate did not err in determining that termination of parental rights was in the best interests of the child. Accordingly, we affirm the magistrate's decree terminating Father's parental rights.

Judge GRATTON and Judge MELANSON **CONCUR.**